UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EMPIRE TODAY, LLC,                          *
                                            *
                Plaintiff,                  *
                                            *
        v.                                  *        Civil Action No. 08-11999-JLT
                                            *
NATIONAL FLOORS DIRECT, INC.,               *
et al.,                                     *
                                            *
                Defendants.                 *

MEMORANDUM

June 2, 2011

TAURO, J.

I.      Introduction

        This case involves a dispute primarily between Empire Today, LLC ("Plaintiff") and

National Floors Direct, Inc. ("NFD"), two at-home (or on-site) carpet and flooring providers.

Plaintiff brought various claims against NFD, including tortious interference, Lanham Act

violations (trademark infringement as well as false or misleading advertisement), and alter ego

liability.  NFD counterclaimed for defamation, tortious interference, false or misleading

advertisement under the Lanham Act, and abuse of process.

        During a thirteen-day trial, the jury heard most of Plaintiff's and NFD's claims, excluding

those claims under Massachusetts General Laws chapter 93A, which this court has reserved.[1]  The

jury found against Plaintiff on all of its claims and in favor of NFD on its abuse of process

counterclaim.  Following this adverse jury verdict, Plaintiff filed a Motion for Judgment as a

_____

        [1] See infra note 7.

Matter of Law, Pursuant to Fed. R. Civ. P. 50(b) [#303].  Additionally, both Plaintiff and NFD

filed the following motions asserting claims under Chapter 93A: NFD's Motion for Judgment on

Its Counterclaim Under M.G.L. Chapter 93A [#312], Plaintiff's Motion to Strike Defendant's

Motion for Judgment on Its Chapter 93A Counterclaim [#324], Plaintiff's Motion for Judgment

on Its Chapter 93A Claim [#327], and NFD's (1) Opposition to Empire's Motion to Strike NFD's

Chapter 93A Counterclaim; (2) Opposition to Empire's Motion to Strike NFD's Fee Petition, or

in the Alternative, (3) NFD's Motion to Amend Counterclaim [#333].

Presently at issue are the aforementioned motions as well as NFD's request for attorneys'

fees: NFD's Application for Attorney's Fees and Costs Under Mass. Gen. L. Ch. 93A [#316],

NFD's Motion for Attorneys' Fees Pursuant to 15 U.S.C. § 1117(A) [#321], and Plaintiff's

Motion to Strike Defendant's Application for Attorney's Fees and Costs Under Mass. Gen. L.

Ch. 93A [#331].  For the following reasons, Plaintiff's Motions and NFD's Motions are

DENIED.[2]

II.    Background

Plaintiff brought this suit against NFD on December 2, 2008.[3]  After filing an Answer on

March 3, 2009,[4] NFD submitted an Amended Answer and Counterclaim on October 12, 2009.[5]

---

[2] Plaintiff's Assented to Motion to Redact Portions of Trial Record [#320] and NFD's
Assented to Motion to Redact Portion of Trial Record [#337] are ALLOWED.

[3] See Compl. Injunctive & Other Relief [#1].

[4] Answer Def. Nat'l Floors Direct, Inc. 1st Am. Compl. [#38].

[5] Nat'l Floors Direct Inc.'s Am. Answer & Countercl. [#91] (excluding abuse of process
as a counterclaim).

Eventually Plaintiff filed a Third Amended Complaint,[6] which contained ten counts. Seven of those counts were directed against NFD, five of which were as follows[7]: tortious interference with Plaintiff's contractual relationships, tortious interference with Plaintiff's advantageous business relationships, Lanham Act violations for trademark infringement[8] and false or misleading advertisement,[9] and alter ego liability.[10]

Plaintiff also alleged three counts against former sales representatives and employees for breaching their sales agreements, confidentiality agreements, and duties of loyalty.[11] Plaintiff reached settlement agreements with these individuals before the end of trial.[12]

NFD filed its Answer and Counterclaim,[13] including a Chapter 9A claim that this court reserved for its own judgment. NFD's Counterclaim alleged five counts: defamation, tortious interference with NFD's advantageous business relationships, a Lanham Act violation for false

---

[6] 3d Am. Compl. [#148].

[7] The seven counts, numbers four through ten, were also directed against Samuel ("Sam") Rosenberg, two of his children, Daniel ("Dan") and Aaron Rosenberg, as well as Tower Management Solutions LLC ("Tower Management") and Tower M. Solutions, Inc. See 3d Am. Compl., 37–49 [#148]. This court later reserved two of those sevens counts against NFD, both Chapter 93A claims, for itself. See Trial Tr. vol. 9, 155:1–16, Oct. 15, 2010 [#294].

[8] See 15 U.S.C. § 1114.

[9] See id. § 1125(a)(1).

[10] 3d Am. Compl. [#148].

[11] 3d Am. Compl., 35–37 [#148].

[12] See Order Granting Mot. Voluntary Dismissal Pursuant Settlement Fourteen Defs. Without Prejudice [#204]; Order Granting Voluntary Dismissal Without Prejudice Defs. John Jary & RJ Connection Group, LLC [#205]; Order Dismissal [#258].

[13] Nat'l Floors Direct Inc.'s Ans. & Counterclaim Empire's 3d Am. Compl. [#160] [hereinafter Ans. & Countercl. 3d Am. Compl.].

and misleading advertising, and abuse of process.

Plaintiff brought two Chapter 93A claims against NFD. One Chapter 93A claim alleged that NFD engaged in unfair or deceptive business practices by interfering with Plaintiff's contractual relationships, inducing Plaintiff's employees to violate their duties of loyalty, and using Plaintiff's trade secrets and other confidential and proprietary information.[14] Plaintiff's other Chapter 93A claim alleged that NFD engaged in unfair methods of competition and unfair or deceptive business practices in trade or commerce by NFD's use of certain advertising statements that Plaintiff alleged NFD could not substantiate.[15]

In its Chapter 93A claim, NFD alleged that Plaintiff engaged in unfair or deceptive acts in the conduct of trade or commerce by its advertising, its defamation of NFD, and its interference with NFD's business relationships.[16]

After a thirteen-day trial that excluded the Chapter 93A claims, the jury found against Plaintiff on all of its claims, in favor of NFD solely on its abuse of process counterclaim, and awarded NFD $500,000.00.[17]

A.    <u>Findings of Fact</u>[18]

---

[14] 3d Am. Compl., 41–42 [#148].

[15] 3d Am. Compl., 31–34 [#148].

[16] Ans. & Countercl. 3d Am. Compl., 41–42 [#160].

[17] Verdict Form [#396].

[18] This court does not discuss the Parties' claims at trial that are not relevant to the Parties' pending motions.

Based upon the evidence, the jury could have found the following facts.[19]  Plaintiff is a shop-at-home, home improvement company that sells and installs carpet and flooring in, among other places, the Boston and Hartford areas.[20]  NFD is a direct competitor of Plaintiff in the Boston and Hartford markets.[21]  Unlike other companies, neither Plaintiff nor NFD utilizes storefronts, and both have a comparatively limited selection of inventory.[22]  Both Plaintiff and NFD emphasize next-day installation,[23] focus on television advertising,[24] and rely on effective salespeople.[25]

Plaintiff's former employees and sales representatives entered into agreements that included confidentiality, non-compete, and non-solicitation provisions.[26]  Some of those

---

[19] See, e.g., Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 756 (1st Cir. 1996) (reciting facts as jury could have found them in the context of considering 93A and 50(b) claims); Astrolabe, Inc. v. Esoteric Techs. Pty, Ltd., No. 01-11352-PBS, 2002 U.S. Dist. LEXIS 5764, at *2 (D. Mass. Mar. 29, 2002) (same).

[20] See, e.g., Trial Tr. vol. 1, 132:16–24, Sept. 27, 2010 [#255]; Pl. Empire Today, LLC's Pre-Trial Mem., Ex. A [#217].

[21] See, e.g., Trial Tr. vol. 2, 121:13–15, Sept. 28, 2010 [#256]; Pl. Empire Today, LLC's Pre-Trial Mem., Ex. A [#217]; Trial Tr. vol. 10, 32:13–17, 51:20–53:5, 108:18, 118:3–4, 129:8–13, Oct. 12, 2010 [#308].

[22] See Trial Tr. vol. 1, 138:9–139:4 [#255]; Trial Tr. vol. 7, 10:5–21, 33:19–22, 137:1–3, Oct. 6, 2010 [#268].

[23] Trial Tr. vol. 1, 139:14–22 [#255]; Trial Tr. vol. 7, 185:6–13 [#268].

[24] See Trial Tr. vol. 1, 141:23–142 [#255]; Trial Tr. vol. 7, 139:16–140:2 [#268].

[25] See, e.g., Trial Tr. vol. 1, 143:22–25 [#255]; Trial Tr. vol. 7, 10:5–21, 105:24–106:2 [#268].

[26] See, e.g., Pl.'s Trial Ex. NNN, 4 (Donald Plouff's agreement); Trial Tr. vol. 6, 13:18–15:6, Oct. 4, 2010 [#262].  See generally Pl.'s Trial Exs. 57–69, 73–99 (Plaintiff's confidentiality and nondisclosure agreements); Trial Tr. vol 2, 30:9 [#256].

employees had been managers.[27]  Roughly ten managers and thirty sales representatives left Plaintiff to work for NFD,[28] some under acrimonious conditions.[29]

Plaintiff argued that NFD, through its employees and management, had solicited Plaintiff's employees to leave Plaintiff and join NFD.[30]  One former sales representative for both Plaintiff and NFD testified as such.[31]  This former representative also testified that NFD had Plaintiff's flooring samples and documentation, including (allegedly) confidential par sheets[32] and a "pre-installation checklist."[33]  Her testimony, however, was sharply disputed by various individuals' testimony[34] and at times contradicted by her cross-examination.[35]

---

[27] See, e.g., Trial Tr. vol. 2, 15:17–18 [#256].

[28] Trial Tr. vol. 2, 22:10–11 [#256] (Steve Silver's examination); Trial Tr. vol. 6, 96:7–11 [#262] (Dan Rosenberg's examination).

[29] Trial Tr. vol. 2, 24:2–25:25 [#256] (Plaintiff's version of Amidon's departure).  But some representatives seem to have then returned to Plaintiff.  Trial Tr. vol. 2, 97:2–6 [#256].

[30] Trial Tr. vol. 1, 101:19–22 [#255] (opening statements).

[31] Trial Tr. vol. 3, 99:9–100:21, 101:20–25, 105:21–25, Sept. 29, 2010 (testimony of Diane Johnston) [#260].

[32] See Pl.'s Trial Ex. 20 (Plaintiff's "Boston Par Sheet").  Par sheets, or pricing sheets, generally identify products and various pricing levels associated with the commissions that representatives can receive for selling those products.  Trial Tr. vol. 2, 152:16–20 [#256].  Par sheets may also identify specifics about those products, such as the face weight, vendor, or fiber type, as well as which products are being promoted.  Trial Tr. vol. 1, 152:24–154:2 [#255].  Plaintiff's par sheets also include information on financing and other charges.  Trial Tr. vol. 1, 156:15–22 [#255].

[33] Trial Tr. vol. 3, 102:15–104:17, 105:5–20 [#260] (testimony of Diane Johnston).

[34] See, e.g., Trial Tr. vol. 6, 56:4–18, 59:19–60:6 [#262] (testimony of Donald Plouff); Trial Tr. vol. 11, 83:24–84:11, Oct. 13, 2010 [#309] (testimony of Jack Danhof that he never saw one piece of Plaintiff's documentation or samples).

[35] Trial Tr. vol 3, 117:5–118:24, Sept. 29, 2010 [#260] (Diane Johnston admitting that she went to NFD on her own initiative after a chance meeting with an NFD representative).

In fact, both Parties may have had each others' old par sheets and commission structure.[36] But it is unclear whether this material was proven as confidential and the Parties do not press the matter post-trial on the 50(b) or 93A claims.

Since April 2006, NFD has advertised commercials that referenced a "15% or its [sic] free" campaign ("15% Promotion").[37] These television commercials promise to beat "anyone's price by 15% or it's free."[38]

Plaintiff alleged that NFD was not providing the discount advertised in its 15% Promotion.[39] Plaintiff pointed to (1) a customer order filled out by a sales representative that contained a discount of less than 15% and (2) customer orders in which NFD, namely Dan Rosenberg, reduced the prices by only 13%, despite claiming that he was offering a 15% discount.[40]

In both instances, however, customers were only entitled to receive 15% off of their orders if certain conditions were met. Customers, for instance, had to present a written quote from another company for the same quality and quantity of flooring that they were seeking from

---

[36] See NFD's Trial Ex. AA (e-mail from one of Plaintiff's office managers discussing paying a former NFD sales representative for NFD's par sheet).

[37] NFD's Trial Ex. BBB [#297] (introduced by Plaintiff); see also Trial Tr. vol. 6, 135:13–36:5 [#262]; Trial Tr. vol. 7, 170 [#268].

[38] Pl.'s Trial Ex. 111 [#297] (CD containing .wmv files).

[39] Trial Tr. vol. 12, 96:19–101:21, Oct. 14, 2010 (Plaintiff's closing statement) [#301].

[40] Pl.'s Trial Ex. 1, NFD 00273, 00274 (wherein Dan Rosenberg, after a customer's complaint, then reduced the price by 15%). Dan Rosenberg is NFD's official treasurer and works as the director of sales for NFD. Trial Tr. vol. 6, 72:16–25 [#262]. He is also likely the sole officer of Tower Management. Trial Tr. vol. 6, 100:1–4 [#262]. Tower Management compensates Sam Rosenberg—Dan and Aaron Rosenberg's father—for his consulting work with NFD. See Trial Tr. vol. 6, 99:10–21 [#262].

NFD.[41]  The aforementioned order filled out by the sales representative did not receive 15% off because it did not demonstrate the necessary prerequisites.[42]

As for the second point, Dan Rosenberg explained that he sometimes took 15% off a competitor's price by dividing the competitor's price by 1.15.[43]  This price calculation indeed results in only 13% off of the competitor's price, whereas multiplying by 0.85 would result in a 15% price reduction.  Of the 10% of NFD's orders that beat competitor's prices, this calculation by Dan Rosenberg was used in about 10% of those orders.[44]  Otherwise, NFD beat its competitors' prices by 15%.[45]  Moreover, when the conditions of the 15% Promotion were met,

---

[41] Trial Tr. vol. 10, 110:14–25 [#308] (Sam Rosenberg's direct); Trial Tr. vol. 6, 142:22–143:10, 147:4–11 [#262] (Dan Rosenberg's testimony); Trial Tr. vol. 7, 187:18–20 [#301] (Aaron Rosenberg testifying about disclaimers on commercials regarding qualifying terms); see also Trial Tr. vol. 10, 151:4–6 [#308] (Sam Rosenberg explaining that the conditions include that the order specify the same area, padding, rip-up, and cart-away).

[42] Trial Tr. vol. 10, 149:18–150:7 [#308] (Sam Rosenberg).  Only an estimated ten percent of NFD's orders beat competitor's prices.  Trial Tr. vol. 10, 109:10–111:7 [#308] (Sam Rosenberg).

[43] Trial Tr. vol. 6, 155:7–8 [#262].  Sale representatives were required to call NFD's office to have a deal approved only if they needed to drop below the lowest price on their price list to meet the 15% guarantee.  Trial Tr. vol. 6, 146:15–24, 157:23–25 [#262]; Trial Tr. vol. 11, 44:16–25 [#309] (Donald Plouff saying he had never heard of Dan Rosenberg's calculations before trial).

[44] Trial Tr. vol. 10, 109:10–111:7 [#308] (Sam Rosenberg).  Given that Dan did not join NFD until late 2008, this mode of calculation may not have begun until then.  See Trial Tr. vol. 10, 153:20–25 [#308].  But see Trial Tr. vol. 7, 171:5–11 [#268] ("The way we discount the price is the same way that our computer discounts the price and discounts the percent off the order, which is, to divide it by 1.15, which is the same computer that all the other, you know, thousands of flooring retailers use across the country, and that's the way that a percent discount is taken off a price.").

[45] See, e.g., Pl.'s Trial Ex. EEEE (NFD order of Joyce Dore); Trial Tr. vol. 10, 109:10–111:7 [#308].

the sales representatives calculated the 15% discount in the field by multiplying by 0.85.[46]  NFD

also cast Dan Rosenberg's calculations both as an issue of internal disagreement[47] and a method

used by NFD's own management software.[48]

NFD asserted various counterclaims against Plaintiff.  The only two relevant here are

Count IV, abuse of process,[49] and Count V, Chapter 93A.[50]  A chronicling of the evidence paints

the following story.  Plaintiff had identified NFD as an aggressive challenger in the Boston market

by April 2007.[51]  By September of 2007, Plaintiff expressed that its most significant challenge

came from NFD.[52]  As a marketing tactic, Plaintiff performed at least eight "secret shops."[53]

---

[46] E.g., Trial Tr. vol. 10, 109:10–111:7 [#308] (Sam Rosenberg); Trial Tr. vol. 11, 80:24–81:2 [#309] (Jack Danhof testifying that "[NFD] multipl[es] it by .85 and that would be your price and there was no if, ands, but, questions about it."); Trial Tr. vol. 11, 43:17–44:15 [#309] (Donald Plouff testifying that all the sales representatives gave an accurate 15% and did not follow Dan Rosenberg's method).

[47] Trial Tr. vol. 7, 173:22–174:3 [#268] (Aaron Rosenberg testifying "I don't think that we're only beating them by 13%; I think we're beating them by 15% . . . so the math's the math; you, there's no argument about that."); Trial Tr. vol. 10, 115:1–8 [#308] (Sam Rosenberg testifying as to his own lack of awareness and never hearing any complaints); Trial Tr. vol. 11, 44:5 [#309].

[48] See Trial Tr. vol. 7, 171:5–11 (Aaron Rosenberg) [#268]; Trial Tr. vol. 10, 114:2–25 [#308] (Sam Rosenberg).

[49] Ans. & Countercl. 3d Am. Compl., 40–41 [#160].

[50] Ans. & Countercl. 3d Am. Compl., 41–42 [#160].

[51] NFD's Trial Ex. CC (explaining that NFD drops its price "well below the low to gain market share" and conjecturing that NFD was recruiting Plaintiff's best closers).

[52] NFD's Trial Ex. BB. (Month End Market Report, prepared by Robert Carter).

[53] NFD's Trial Ex. BB.  In one form of a "secret shop," an employee or manager of a business pretends to be a customer of a competitor so that the employee or manager may learn more about the competitor, including its pricing.  See Trial Tr. vol. 2, 88:11–89:5, 91:19–92:22 [#256] (Steve Silvers discussing Plaintiff's secret shops); NFD's Trial Ex. HH (discussing the commission structure at NFD in an e-mail sent to Steve Silvers).

Plaintiff's fortunes worsened as NFD's market share grew and Plaintiff's market share decreased.[54] The causes behind the Parties' changes in market positions were hotly contested at trial. NFD's growing market share in Boston was, at least in large part, attributable to NFD's low prices.[55]

Although some of Plaintiff's employees were calling for Plaintiff to lower its prices by October 30, 2007 (and likely by June 2007),[56] Plaintiff did not decide to cut its prices until April 14, 2008.[57] Meanwhile, from 2006 to 2009, Plaintiff cut its spending on advertising in the Boston market in half,[58] which was more than it had reduced its spending on advertising in other markets.[59]

Plaintiff also had management problems in its Boston office.[60] Plaintiff had planned to close its Boston office in spring of 2008.[61] But Plaintiff eventually cancelled this plan partly

---

[54] See, e.g., Trial Tr. vol. 1, 101:9–18 [#255] (Plaintiff, in opening, saying that "NFD took over in 2008 as the leader in Boston as compared to Empire"); Trial Tr. vol. 10, 32:20–33:8 [#308] (Defendant's expert Zito explaining that NFD was able to take leads that were going to Plaintiff because of lower prices); Trial Tr. vol. 9, 109:1–2, 134:18–25, Oct. 8, 2010 [#294].

[55] Even Plaintiff appeared to admit this fact. See Trial Tr. vol. 2, 159:2–6 [#256]; Pl.'s Trial Ex. CC (Monthly End Market Report in April 2007, prepared by Rob Carter; stating that NFD was "dropping well below the low to gain market share and our reps are feeling frustrated"); Pl.'s Trial Ex. W (e-mail from Rob Carter to Steve Silvers and others on October 30, 2007, stating NFD was beating Plaintiff's prices and Plaintiff needed to be "aggressive with [its] pricing to combat [NFD's] strategies").

[56] See supra note 55.

[57] See Trial Tr. vol. 2, 150:3–157:2 [#256] (mentioning NFD's Trial Ex. G).

[58] Trial Tr. vol. 2, 147:15–19 [#256].

[59] Trial Tr. vol. 9, 105:20–21 [#294].

[60] See Trial Tr. vol. 2, 101:25–102:1 [#256].

[61] See Trial Tr. vol. 2, 189:24–190:7 [#256].

because it did not want to leave NFD without direct competition, which would ease NFD's expansion into other areas.[62]

Plaintiff also felt that NFD was poaching Plaintiff's representatives.[63] In response, Plaintiff began sending cease-and-desist letters to NFD.[64]

Additionally, two e-mail chains exist that could imply that Plaintiff viewed legal action against NFD as a tactical means of burying its competitor. First, a March 2008 e-mail from Todd Dickson[65] to David Elenowitz[66] and Steve Silvers[67] discussed potential strategies to deal with difficulties in Plaintiff's Boston market. One of the strategies mentioned was: "We should aggressively work on the legal front. (non-competes and potentially their advertising/disclosures/disclaimers) [sic] This could be an expensive distraction at a time where [NFD is] investing in a new facility and heavy advertising."[68] Meanwhile, Plaintiff's sales

---

[62] See Trial Tr. vol. 2, 190:8–191:3 [#256]; NFD's Trial Ex. R (March 25, 2009 e-mail from Steve Silvers to David Elenowitz containing Steve Silvers' draft letter to Bank of America); infra notes 75–78 and accompanying text.

[63] See, e.g., NFD's Trial Ex. CC; Trial Tr. vol. 1, 107:1–5 [#255].

[64] Trial Tr. vol. 2, 32:21–33:4 [#256]; Trial Tr. vol. 7, 151:18–23 [#268].

[65] Todd Dickson is Plaintiff's chief marketing officer. Trial Tr. vol. 2, 77:7–12 [#256].

[66] By 2001, David Elenowitz had retained ownership and control over Plaintiff (through Mercury Capital Management ("Mercury")). See, e.g., Trial Tr. vol. 2, 70:18–22, 72:11–21, Sept. 28, 2010 [#256] (Steve Silvers explaining that Elenowitz is chairman of the board and owner of Mercury, which acquired Plaintiff, and Elenowitz is the "ultimate decision maker"); David Elenowitz Dep., Feb. 24, 2010, 9:15 a.m. (saying that Mercury owned Empire and Elenowitz was chairman of the board and "final decision maker" of Plaintiff) (not marked as exhibit but played to jury on Trial Tr. vol. 11, 5:16–17 [#309]).

[67] Steve Silvers is the CEO of Plaintiff. Trial Tr. vol. 1, 130:6–7 [#255].

[68] NFD's Trial Ex. L.

continued to suffer, and it reduced its prices by April 14, 2008.[69]

Second, in an October 2008 e-mail, Elenowitz wrote to Silvers and Dickson that he would like to see if it would be feasible to get a "large amount" of damages and take the "most aggressive" legal position, including "appropriate suing individuals [sic]."[70]  Silvers replied to Elenowitz (and Dickson) that:

> [If Plaintiff] truly want[ed] to hurt [a competitor in Chicago] and NFD (including in this conversation at this point as to looking to expand the legal actions to them) we should leverage the profit in other markets to offset loses in Chicago and Boston.  The competitors do not have this advantage and [in] losing money they will need to continue to dig into their own pockets versus leveraging other profitable markets. . . . If we do start to make some progress and get back market share via more leads and higher closing, eventually the sale people side will take care of itself.[71]

These e-mails revealed Plaintiff's top management discussing legal action not merely to right NFD's wrongs, but also seemingly as a tactical means of competition against NFD and as a tool to force NFD to incur legal fees.

Meanwhile, by May 2008, Plaintiff filed at least one complaint with the Better Business Bureau ("BBB") regarding NFD's 15% Promotion.[72]  On December 2, 2008, Plaintiff filed its initial lawsuit against NFD.[73]  Plaintiff also named as Defendants Sam Rosenberg and fourteen of

---

[69] See NFD's Trial Ex. GG; NFD's Trial Ex. O; Trial Tr. vol. 2, 156:24–157:2 [#256].

[70] NFD's Trial Ex. U.

[71] NFD's Trial Ex. U.  Plaintiff emphasized that (a) these e-mails were merely about a financing program and (b) Plaintiff had already started the process of putting together its legal work.  Trial Tr. vol. 3, 66:15–67:5 [#260].

[72] Pl's Trial Ex. EEEE.

[73] Compl. Injunctive & Other Relief [#1].

Plaintiff's former employees or sales representatives who allegedly began working for NFD.[74]

By March 2009, Silvers wrote that Plaintiff's Boston office was going to close.[75]  The poor performance of Plaintiff's Boston office was credited in particular to being beaten on price by NFD, but also to the absence of effective leadership at Plaintiff's Boston office and generally poor economic conditions.[76]  A sales representative from the Boston office pointed out that after Plaintiff left Boston, NFD would have "free reign."[77]  Moreover, Plaintiff would only be able to get back into the Boston market by underselling NFD and the sales representative wondered whether Plaintiff would next have to pull out of the Hartford market.[78]  Plaintiff decided to not close its Boston office.

III.    Discussion

This court will consider first Plaintiff's Rule 50(b) Motion, followed by the Parties' Chapter 93A claims.

A.    Plaintiff's Motion for Judgment as Matter of Law

Plaintiff moves for judgment as a matter of law pursuant to Rule 50 on Count IV of NFD's abuse of process counterclaim, asking for the jury's verdict to be set aside.  Plaintiff claims that NFD fell short of its burden to provide the jury with an evidentiary basis on which to award

---

[74] Compl. Injunctive & Other Relief [#1].

[75] NFD's Trial Ex. OOOO.

[76] See, e.g., Trial Ex. OOOO.

[77] NFD's Trial Ex. OOOO.

[78] NFD's Trial Ex. OOOO.

any fees.[79]  Plaintiff argues that NFD mentioned its legal fees incurred in the lawsuit only twice at

trial, and in merely general and unsubstantiated ways.[80]  This evidence, Plaintiff argues, does not

provide the specificity regarding attorney hours, charges, and rates that is necessary to determine

the reasonableness of the attorneys' fees sought.[81]  Moreover, none of NFD's attorneys testified

or offered any affidavits as to the reasonableness of their bills.[82]  NFD instead argues that the

jury's award for abuse of process was based not merely on attorneys' fees and costs incurred in

defending against Plaintiff's claims, but on the financial harm caused to NFD's business as a result

of Plaintiff's lawsuit.[83]  Plaintiff rebuts NFD's assertion by arguing that the testimony at trial

about the financial harm to NFD was never quantified by documentary or expert evidence.[84]

Upon a Rule 50 motion, a court may (1) let the verdict stand, (2) enter judgment as a

matter of law for the moving party, or (3) order a new trial.[85]  In ruling on a motion for judgment

as a matter of law, a court considers the facts and evidence in a light most favorable to the jury's

verdict.[86]  But Rule 50 authorizes a court to grant a motion for a judgment as a matter of law only

---

[79] See Pl. Empire Today, LLC's Mem. Supp. Rule 50(b) Mot. J. Matter Law Def.'s Abuse Process Countercl., 1 [#304] [hereinafter Pl.'s Rule 50(b) Mot.].

[80] Pl.'s Rule 50(b) Mot., 2–3 [#304].

[81] Pl.'s Rule 50(b) Mot., 3–6 [#304].

[82] Pl.'s Rule 50(b) Mot., 3 [#304].

[83] Nat'l Floor Direct, Inc.'s Opp'n Pl.'s Rule 50(B) Mot. J. Matter Law, 1 [#314].

[84] Pl.'s Reply Supp. Rule 50(b) Mot., 3 [#348].  Plaintiff, however, does not cite to any case law requiring such evidence.

[85] Fed. R. Civ. P. 50(b).

[86] See, e.g., Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 765 (1st Cir. 2010).  But see Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 436 (1st Cir. 1997) ("In making this determination, the court examines the evidence adduced at trial in the light most favorable to the

if a court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for" the non-moving party.[87] Additionally, a court "may not set aside the jury verdict and direct the entry of a contrary verdict, unless no reasonable jury could have returned a verdict adverse to the moving party."[88] Finally, it is worth noting that credibility "determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[89]

The jury had a sufficient evidentiary basis upon which to award $500,000 to NFD for its abuse of process counterclaim. First, contrary to Plaintiff's claims, the jury had evidence of specific financial harm caused by Plaintiff's lawsuit against NFD. Aaron Rosenberg, NFD's president,[90] testified that NFD incurred more than $1.5 million in defense costs.[91] Moreover, Aaron Rosenberg testified that the diversion of those funds from advertising resulted in lost

---

nonmoving party, drawing all reasonable inferences in its favor." (internal citation omitted)).

[87] Fed R. Civ. P. 50(a)(1).

[88] Morrison, 108 F.3d at 436 (internal citation omitted); see also Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 22 (1st Cir. 2010) ("[A] Rule 50 motion is properly granted when the facts and inferences viewed in the light most favorable to the verdict point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict." (internal citations and quotation marks omitted)).

[89] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (internal citations omitted) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" (internal citations omitted)).

[90] Trial Tr. vol. 7, 157:5–7 [#268].

[91] Trial Tr. vol. 7, 192:18 [#268].

revenue and, in turn, lost profits of more than $2.7 million.[92] This testimony was corroborated by

Sam Rosenberg, NFD's consultant with over forty years of experience in the carpet business.[93]

Specifically, diverting NFD's legal fees of $1.5 million to advertising would have translated into

approximately 6 million dollars in sales and 3 million dollars in profits.[94] Second, various excerpts

of testimony throughout the trial provided an abundant basis for the jury to decide that NFD had

suffered general harm to its business.[95] In sum, the testimony explained how the Rosenbergs'

diversion of time, attention, and financial resources was a result of Plaintiff's suit.

Plaintiff offers two replies. First, the Rosenbergs' estimation of lost profits (or revenue or

potential advertising) is based on their underlying estimate of legal fees at trial, which is not

supported by credible evidence and, therefore, none of their estimates can support the jury award

---

[92] Trial Tr. vol. 7, 193:7–15 [#268] (Aaron Rosenberg explaining that for every dollar NFD spent in defending against Plaintiff's lawsuit, NFD lost approximately four dollars); see also Trial Tr. vol. 7, 209:23–210:2 [#268] (same).

[93] See Trial Tr. vol. 10, 142:6 [#308] (testifying as to forty years of experience); Trial Tr. vol. 7, 147:7–12, 195:24–195:1 [#268] (providing testimony of others who saw Samuel Rosenberg's role as a professional consultant).

[94] Trial Tr. vol. 10, 118:7 –119:14 [#308].

[95] See Trial Tr. vol. 7, 28:24–29:12 [#268] (discussing "devastating impact on [NFD's] ability to do business" and resulting layoffs); Trial Tr. vol. 7, 29:7–12 [#268] (testifying that lawsuit has forced NFD to "lay off approximately 45 sales reps, approximately 40 employees" and "dramatically" diminish its advertising budget); Trial Tr. vol. 7, 30:10–31:12 [#268] (explaining how the lawsuit prevented the Rosenbergs from running NFD's business, where they would otherwise have spent "every waking hour"); Trial Tr. vol. 7, 56:12–57:5 [#268] (mentioning how the lawsuit diverted money from advertising and NFD went through a "total standstill in our new market as a result of this case"); Trial Tr. vol. 7, 189:9–21 [#268] (discussing how NFD was forced to take out a $1 million loan to keep business going because of the lawsuit); Trial Tr. vol. 7, 190:22–192:7 [#268] (demonstrating NFD's inability to operate during and because of trial, including temporarily closing offices).

of $500,000 as NFD's harm.[96]  Second, Plaintiff argues, much of NFD's evidence of financial

harm is not quantified.[97]  But, for the reasons explained below, both replies are insufficient to

overturn the jury's verdict on an abuse of process counterclaim for overall financial damage to

NFD.

Plaintiff's first reply falls short for three reasons.  First, although it is true that the legal

costs incurred in defending against Plaintiff's suit are specific damages and such damages must be

affirmatively proved,[98] Plaintiff does not provide any authority that the testimony of a company's

president is an insufficient basis for a jury to determine damage to a company resulting from

defending against a lawsuit.[99]  Second, Plaintiff did not provide any evidence contradicting NFD's

calculations on the matter.  Third, Plaintiff's attempt to invalidate the jury's award based upon

NFD's estimated legal fees ignores the other grounds for the jury's award.  Specifically, NFD's

estimate of financial harm was not based solely on its estimated legal fees.  NFD's estimated

financial harm was instead grounded in various considerations, such as NFD's inability to operate

certain offices and the Rosenberg's inability to operate NFD during trial.[100]  And so, even if

NFD's estimate of legal fees is not supported by credible evidence, the jury nonetheless had other

---

[96] Pl.'s Reply Supp. Rule 50(b) Mot., 2 [#348].

[97] Pl.'s Reply Supp. Rule 50(b) Mot., 3 [#348].

[98] Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 645 (2010).

[99] Similarly, all of the cases relied upon by Plaintiff involved parties who were seeking attorneys' fees rather than economic harm arising from an abuse of process.  For instance, Pride Hyundai, Inc. v. Chrysler Financial Co., 355 F. Supp. 2d 600 (D.R.I. 2005), involved a party attempting to enforce a contract provision for recovery of attorneys' fees and had nothing to do with abuse of process or recovery of harm to a company's business.

[100] See supra note 95.

sufficient, independent support for its abuse of process award.

Plaintiff's second reply falters for a few reasons. First, it is contradicted by the record: NFD did in fact provide specific damages in some instances.[101] Second, Plaintiff does not cite to any authority that (more) quantification of general financial harm to NFD was necessary to support the jury's finding for abuse of process. Finally, Plaintiff's two supporting points here, regarding this court's exclusion of Dan Rosenberg's testimony of specific damages and NFD's improved financial condition, are insufficient to support overturning the jury's verdict. First, this court's act of preventing Dan Rosenberg from testifying at one point about NFD's costs[102] does not change the fact that the jury repeatedly heard testimony about NFD's specific and general damages.[103] Second, the fact that NFD's financial condition improved after it was sued is an insufficient basis to undermine the jury's determination that NFD suffered damages that prevented it from an even more profitable financial condition. The jury could have, for instance, also considered that NFD experienced disproportionately large monetary losses before Plaintiff's lawsuit because, while in its infancy, NFD aggressively spent a large amount of money to open new markets, and that NFD perhaps only began to realize the revenue from this spending after Plaintiff's suit.[104]

Given the above, a reasonable jury had a legally sufficient evidentiary basis upon which to

---

[101] See supra notes 91–94 and accompanying text.

[102] See Trial Tr. vol. 7, 29:7–30:17 [#268].

[103] See supra notes 91–95 and accompanying text.

[104] See Trial Tr. vol. 7, 56:16–25, 56:19–21 [#268]; cf. Trial Tr. vol. 1, 135:17–23 [#255] (Steve Silvers testifying that "it takes 18 to 24 months before" a "new market gets to the point where the revenue are at the levels where you want them to be at" and that it is a "slow" and "very expensive process").

determine that NFD was owed $500,000 as a result of Plaintiff's abuse of process. This court therefore holds that it is inappropriate to disturb the jury's verdict.

B.     <u>Chapter 93A</u>

1.     <u>NFD's Chapter 93A Request</u>

NFD, in its <u>Motion for Judgment on its Counterclaim Under M.G.L. Chapter 93A</u> [#312], requests entry of judgment on Count V of its counterclaim against Plaintiff for violation of M.G.L. chapter 93A.[105] First, NFD argues that Plaintiff engaged in unfair and deceptive conduct in violation of Chapter 93A.[106] The unfair and deceptive conduct was Plaintiff's abuse of the legal process by filing suit against NFD, which was intended to hurt NFD's business.[107] NFD also points to the manner in which Plaintiff conducted the lawsuit, such as waiting two years to file suit, refraining from seeking injunctive relief, and suing employees individually.[108] Second, NFD argues that Plaintiff's conduct was undertaken willfully and knowingly to harm NFD's business and, therefore, multiple damages are justified under Chapter 93A, Section 11.[109]

Plaintiff argues, <u>inter alia</u>, that NFD's Chapter 93A counterclaim should be stricken

---

[105] NFD also requests a trebling of the jury's award of $500,000 (to $1.5 million), reasonable attorneys' fees and costs, and pre-judgment interest. Nat'l Floor Direct, Inc's Mot. J. Countercl. Under M.G.L. Chapter 93A, 1–2 [#312].

[106] Nat'l Floor Direct, Inc.'s Mem. Law Supp. Mot. J. Countercl. Under M.G.L. Chapter 93A, 1–3 [#313] [hereinafter NFD's Mem. Supp. 93A].

[107] NFD's Mem. Supp. 93A, 1–2 [#313]. NFD also argues that Plaintiff's motive was to hurt NFD because, as the evidence showed, Plaintiff lost revenue due to Plaintiff's refusal to compete with NFD on price (rather than any alleged wrongful conduct by NFD). <u>Id.</u> at 3.

[108] NFD's Mem. Supp. 93A, 2 [#313].

[109] NFD's Mem. Supp. 93A, 3–4 [#313]. This court need not consider NFD's other arguments for attorneys' fees and costs as well as pre-judgment interest under Chapter 93A given its disposition of NFD's Chapter 93A claim.

because NFD, when it asserted its Chapter 93A claim, expressly mentioned only Plaintiff's alleged false advertising, defamation, and tortious interference but did not explicitly reference abuse of process.[110] NFD replies that its Chapter 93A counterclaim incorporated by reference all of the previous paragraphs of NFD's <u>Answer and Counterclaim</u> [#160], including those that set forth the facts surrounding the alleged abuse of process and the abuse of process count itself.[111]

First Circuit law provides that a party may satisfy its pleading requirements by incorporating by reference other paragraphs within the same complaint or counterclaim.[112]

This court assumes, for the purposes of deciding NFD's Chapter 93A counterclaim, that NFD's abuse of process counterclaim was incorporated by reference into NFD's Chapter 93A counterclaim. NFD satisfied its pleading requirements because its Chapter 93A counterclaim explicitly incorporated all the previous paragraphs, including its abuse of process counterclaim. NFD's Chapter 93A counterclaim contained at least two incorporating statements. First, NFD's counterclaim explicitly "incorporated by reference Paragraphs 1 through 82 of this counterclaim

---

[110] Pl. Empire Today, LLC's Combined Mem. Law Supp. Mot. Strike & Opp'n Def.'s Mot. J. Chapter 93 Countercl., 2–4 [#324].

[111] Nat'l Floor Direct, Inc.'s: (1) Opp'n Empire's Mot. Strike NFD's Chapter 93A Countercl.; (2) Opp'n Empire's Mot. Strike NFD's Fee Pet., or, Alternative, (3) NFD's Mot. Amend Countercl., 2–3 [#333] [hereinafter NFD's Opp'n Mot. Strike].

[112] <u>Simas v. First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 47 (1st Cir. 1999) (holding that a count for violation of the Federal Credit Union Act included an adverse employment claim because it incorporated by reference other portions of complaint setting forth facts supporting such a claim); <u>Pujol v. Shearson Am. Express, Inc.</u>, 877 F.2d 132, 138 (1st Cir. 1989) (reversing a dismissal for failure to state a claim for conversion where the cause of action for malicious prosecution incorporated by reference allegations that would support a conversion claim); <u>Chaabouni v. City of Boston</u>, 133 F. Supp. 2d 93, 95 (D. Mass. 2001) (holding that a two-sentence negligence count that incorporated by reference previous paragraphs of the complaint met the notice pleading requirement for negligence).

as through fully set forth herein."[113] This reference was meant to include the material that was not explicitly included in the Chapter 93A counterclaim, such as the abuse of process counterclaim. This conclusion is reinforced by another part of NFD's counterclaim, the second incorporating statement, which provided that Plaintiff's "interference with [NFD's] business relationships described herein constitute 'unfair or deceptive acts or practices in the conduct of any trade or commerce . . . .'"[114] This reference was not necessarily limited to NFD's tortious interference counterclaim. Rather, this statement reinforced that NFD's Chapter 93A counterclaim was incorporating NFD's abuse of process, especially because NFD's abuse of process claim included allegations that Plaintiff was impeding NFD from operating its business.[115]

Insofar as Plaintiff argues that NFD's pre-trial memorandum or its initial jury instructions can somehow change the scope of NFD's counterclaim,[116] these claims are without merit. First, and most importantly, the argument is unsupported by the case law. In fact, the counterclaim governs.[117] Second, the record indicates that Plaintiff knew NFD's Chapter 93A counterclaim

---

[113] Ans. & Countercl. 3d Am. Compl. ¶ 82 [#160]; see also Nat'l Floor Direct Inc.'s Am. Ans. & Countercl. ¶ 68 [#91] [hereinafter Am. Ans. & Countercl.].

[114] Ans. & Countercl. 3d Am. Compl. ¶ 86 [#160]; see also Am. Ans. & Countercl. ¶ 71 [#91].

[115] Ans. & Countercl. 3d Am. Compl. ¶¶ 56–57 [#160] (alleging that Plaintiff was attempting to put NFD "out of business" and NFD has suffered harm to its business as a result); Ans. & Countercl. 3d Am. Compl. ¶ 79 [#160] (alleging that Plaintiff was "hindering [NFD's] ability to conduct its business").

[116] See Pl. Empire Today, LLC's Combined Mem. Law Supp. Mot. Strike & Opp'n Def.'s Mot. J. Chapter 93 Countercl., 4–5 [#325].

[117] See Bonneau v. Guidance Fishing Corp., 919 F. Supp. 46, 47 (D. Mass. 1996) (holding that a statement in a joint pre-trial memorandum that a claim should be dismissed did not amount to dismissal or waiver of that claim by the plaintiff where it was asserted at trial).

encompassed NFD's abuse of process counterclaim. After only three days of evidence and long

before Plaintiff had rested, NFD sent Plaintiff a condensed set of jury instructions that included an

instruction on NFD's Chapter 93A claim based on abuse of process.[118] On October 8, 2010, the

ninth day of trial, Plaintiff provided this court with draft jury instructions that included this same

instruction.[119]

This court now turns to the merits of NFD's Chapter 93A counterclaim. Although it is

true that abuse of process can constitute a violation of Chapter 93A,[120] this court, in its

determination of the Parties' 93A claims, is not bound by the jury's finding on abuse of process.[121]

Chapter 93A, Section 2(a) makes unlawful any "[u]nfair . . . acts or practices in the

---

[118] NFD's Opp'n Mot. Strike, Ex. A, 18 [#333].

[119] NFD's Opp'n Mot. Strike, Ex. B, 23 [#333]. Plaintiff points out that it in fact objected to this jury instruction by marking it as disputed. Pl. Empire Today, LLC's Opp'n Def.'s Mot. Amend Countercl., 5, Ex. A [#340] (affidavit of Plaintiff's lawyer who objected to the jury instruction). After this court indicated that it did not want to submit any Chapter 93A claims to the jury, see Trial Tr. vol. 9, 15:1–7, Oct. 8, 2010 [#294], Plaintiff did not object again or bring the objection to the court's attention until these motions. Insofar as Plaintiff objects now or reaffirms its objection, Plaintiff's objection is overruled.

[120] See, e.g., N. Shore Pharm. Serv., Inc. v. Breslin Assocs. Consulting, LLC, 491 F. Supp. 2d 111, 131–32 (D. Mass. 2007).

[121] See, e.g., Perdoni Bros. v. Concrete Sys., Inc., 35 F.3d 1, 5 (1st Cir. 1994) ("Moreover, in the Chapter 93A context, the court has recognized that judge and jury, sitting as independent triers of fact, may reach conflicting conclusions." (internal citation omitted)); Prof'l Servs. Group, Inc. v. Town of Rockland, 515 F. Supp. 2d 179, 196 (D. Mass. 2007) ("'[A] judge may make independent and, therefore, different, findings on the c.93A aspect of a case that arises from the same facts which gave rise to parallel common law claims.'" (alteration in original) (quoting Poly v. Moylan, 423 Mass. 141, 151 (1996))).

conduct of any trade or commerce."[122]  The Massachusetts Supreme Judicial Court ("SJC") has

instructed that "'a practice or act [is] unfair under G. L. c. 93A, § 2, if it is (1) within the

penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral,

unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other

business people.'"[123]  In assessing claims of unfairness, Massachusetts courts have applied what is

commonly known as the "rascality" test: the "'objectionable conduct must attain a level of

rascality that would raise an eyebrow of someone inured to the rough and tumble world of

commerce.'"[124] Additionally, although "'whether a particular set of acts, in their factual setting, is

unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration

as a c. 93A violation is a question of law."[125]

---

[122] <u>Datacomm Interface, Inc. v. Computerworld, Inc.</u>, 396 Mass. 760, 778 (1986) (internal quotation marks omitted).  Chapter 93A, Section 11, states, in relevant part:

> Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . . . bring an action in the superior court . . . for damages and such equitable relief . . . as the court deems to be necessary and proper.

[123] <u>Milliken & Co. v. Duro Textiles, LLC</u>, 451 Mass. 547, 562–63 (2008) (alteration in original) (quoting <u>Morrison v. Toys "R" Us, Inc.</u>, 441 Mass. 451, 457 (2004)).  <u>But see</u> <u>Datacomm.</u>, 396 Mass. at 778 (quoting <u>PMP Assocs., Inc. v. Globe Newspaper Co.</u>, 366 Mass. 593, 596 (1975)) (framing the three requirements as conjunctive considerations to be considered together); <u>Lane v. First Nat'l Bank</u>, 737 F. Supp. 118, 119 (D. Mass. 1989).

[124] <u>Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.</u>, 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting <u>Levings v. Forbes & Wallace</u>, 8 Mass. App. Ct. 498, 504 (1979)).  <u>But see</u> <u>Mass. Emp's Ins. Exch. v. Propac-Mass, Inc.</u>, 420 Mass. 39, 43 (1995) (noting that the rhetoric of "rascality" is "uninstructive").

[125] <u>Milliken</u>, 451 Mass. at 562 (alteration in original) (quoting <u>Schwanbeck v. Fed.-Mogul Corp.</u>, 31 Mass. App. Ct. 390, 414 (1991)).

The elements of an abuse of process claim are that "'[1] process was used, [2] for an ulterior or illegitimate purpose, [3] resulting in damage.'"[126] As the SJC has reaffirmed, the process must be used "to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed."[127] Filing a groundless claim or having an improper motive of "vexation, harassment, or annoyance" is relevant but does not alone suffice to demonstrate ulterior purpose.[128] An ulterior purpose "is not simply the intent to harm the other party directly by bringing the suit."[129] In particular, merely intending to "cause a party to expend substantial time and money to defend against the claim in a suit" does not prove abuse of process.[130] Rather, "there must be [an] intention to use process for coercion or harassment to obtain something not properly part of the suit."[131]

The record does not support that NFD is entitled to judgment on its Chapter 93A claim for abuse of process.

First, NFD has not shown that Plaintiff's acts were unfair or deceptive such that NFD

---

[126] Psy-ed Corp. v. Klein, SJC-10722, 2011 Mass. LEXIS 254, at *32 (Mass. May 12, 2011) (quoting Mahlowitz, 456 Mass. at 636).

[127] Id. (internal citations and quotation marks omitted). The "ulterior purpose must be to gain some collateral advantage" indirectly that is not properly involved in the proceeding, such as the surrender of property or payment of money. Id. at *33–34 & n.35 (citations omitted).

[128] Id. at *32–33.

[129] Id. at *34 n.35 (citations omitted).

[130] N. Shore, 491 F. Supp. 2d at 130 (quoting Broadway Mgmt. Servs., Ltd. v. Cullinet Software, Inc., 652 F. Supp. 1501, 1503 (D. Mass. 1987)).

[131] Id. (internal citation and quotation marks omitted); see also Broadway Mgmt., 652 F. Supp. at 1504 ("In cases involving actionable abuse of process, the collateral benefits sought were well-defined and clearly outside the interests properly pursued in the proceeding." (citations omitted)).

would be entitled to judgment on its Chapter 93A claim. NFD relies on two e-mails that reveal a discussion by Plaintiff's top management of using a lawsuit as a means of hurting NFD's business.[132] The two e-mails, however, are not enough to convince this court that Plaintiff engaged in abusive litigation unfair so as to violate Chapter 93A.[133] NFD relies on a "conclusory allegation"[134] that (1) Plaintiff's discussions of using its deep pockets to compete aggressively and also possibly sue NFD for allegedly wrongful conduct means that (2) the lawsuit was motivated by a desire to injure NFD's business. But NFD has failed to prove a casual connection between (1) and (2). As for the first e-mail, NFD has shown no casual connection between the March 2008 e-mail sent by Dickson and Plaintiff's (not Dickson's) decision to bring suit about eight months later.[135] The second e-mail reflected a conversation among interested parties who were discussing various legitimate business practices, including leveraging profits in other markets and

---

[132] See supra notes 65–71 and accompanying text.

[133] See Broadway Mgmt., 652 F. Supp. at 1504 (explaining that litigating with concurrent intent to burden defendant with cost is not abuse of process without collateral motive or design to coerce).

[134] Amcel Corp. v. Int'l Executive Sales, Inc., No. 93-11128-RCL, 1997 U.S. Dist. LEXIS 23543, at *39 (D. Mass. Sept. 26, 1997) ("The defendants thus make an argument for their abuse of process claim that is a variation of the faulty inductive reasoning expressed by the Latin phrase post hoc ergo propter hoc, after this therefore because of this.").

[135] Silvers, not Dickson, had the ultimate decision regarding whether to sue NFD. See Trial Tr. vol. 3, 88:21–89:5 [#260]. This same point applies to the other exhibits that NFD cites. NFD's Mem. Supp. 93A, 2 [#313]. The monthly reports prepared by Robert Carter do not prove improper motive because there is no evidence that he had any involvement in Plaintiff's decision to sue. See NFD's Trial Exs. BB, CC, and GG. Similarly, the e-mails or letters in which Plaintiff's employees or sales representatives sometimes blame Plaintiff's struggling Boston market on NFD do not address Plaintiff's motive of filing suit. See NFD's Trial Exs. OOOO, R, and W.

recovering market share by generating and closing more leads.[136]  Insofar as Silvers adverted to a

speculative desire to "hurt" NFD, there is no showing that Plaintiff sued to hurt NFD's finances or

to drive it out of business.  Rather, as far as the context indicates and this court's Chapter 93A

decision is concerned, this language of hurting NFD refers to (1) the legal fees that NFD would

incur as a result of a legal action and (2) beating NFD by various legitimate practices, including

providing different financing offers.  In fact, Plaintiff's primary investor and ultimate decision

maker replied to Silvers's e-mail by endorsing only the improvement of financing offers and

increase in advertising.[137]  In sum, mere conversation among interested individuals about a

possible lawsuit does not constitute abuse of process.

The other conduct upon which NFD relies, even in conjunction with Plaintiff's two

e-mails, is also insufficient to entitle NFD to judgment on its Chapter 93A counterclaim.  Parties

have been held liable under Chapter 93A for abusive litigation or conduct that was factually

different from that of Plaintiff's, such as racing to litigate claims (that clearly lacked merit)

without knowing all the facts,[138] or failing to make a reasonable settlement offer in the face of a

meritorious claim.[139]  NFD does not point to evidence revealing such conduct by Plaintiff.  To the

contrary, Plaintiff pursued a course of conduct that outlined the path a litigant not seeking to

abuse the legal process might follow.  Plaintiff waited two years to initiate its suit and attempted

---

[136] See NFD's Trial Ex. U.

[137] NFD's Trial Ex. U ("[W]e should be prepared to gear up spending/actions as much as necessary to counter these competitors, in terms of better financing offers (as noted below), and more aggressive adversting.").

[138] Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 26 (1st Cir. 2007); see also Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 628 (1978).

[139] Int'l Fid. Ins. Co. v. Wilson, 387 Mass. 841, 857–58 (1983).

to resolve its issues outside of court. Plaintiff sent multiple cease-and-desist letters to NFD.[140]

Plaintiff also attempted to reach an administrative resolution through the BBB and only sued after

that avenue proved fruitless.[141] In fact, NFD may not have always engaged Plaintiff in good faith

during this process.[142] This fact further supports that Plaintiff's conduct was not unfair.[143]

Moreover, Plaintiff engaged in settlement discussions.[144] There is no allegation that Plaintiff

refused to discuss a settlement.[145]

Plaintiff's conduct also did not violate any established concepts of unfairness because

Plaintiff did not engage in a level of rascality that would raise an eyebrow of someone inured to

the rough and tumble world of commerce. NFD has not shown that other corporations do not

discuss pursuing legal claims as one of many means of competing against companies that they

believe are engaging in illegal conduct.

---

[140] See supra note 64 and accompanying text.

[141] See Trial Tr. vol. 3, 88:3–89:14 [#260] (Silvers testifying that Plaintiff sued NFD because the BBB could not help them and the BBB "indicated litigation might be the best option" and Plaintiff felt it "had no more choices left").

[142] See Trial Tr. vol. 7, 112–114 [#268] (NFD refused to comply with the BBB because they felt complaints should go through the National Advertising Board). Compare, e.g., Trial Ex. 56 (NFD denying it used Plaintiff's purchase order to create NFD's purchase order), with Trial Tr. vol. 7, 119–120, 159–162 [#268] (Aaron Rosenberg admitting that NFD did use Plaintiff's purchase order);

[143] See Incase Inc. v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007) ("'In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties. What a defendant knew or should have known may be relevant in determining unfairness.'" (quoting Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1980)).

[144] See, e.g., Trial Tr. vol. 5, 11:15–12:22, Oct. 1, 2010 [#272].

[145] See Amcel, 1997 U.S. Dist. LEXIS 23543, at *40 ("A party wishing to drive another to business ruin, through the vehicle of litigation, might well be expected to abjure settlement efforts.").

Second, NFD has also not shown how Plaintiff's conduct was immoral or otherwise unscrupulous. Finally, the cases that NFD cites to support its Chapter 93A <u>Motion</u> are all factually distinguishable.[146]

2. <u>Plaintiff's Chapter 93A Request</u>

Plaintiff requests judgment on Count IX of its <u>Third Amended Complaint</u> on its Chapter 93A claim, $1.6 million in compensatory damages, $3.2 million in multiple damages, attorneys' fees and costs, and pre-judgment interest.[147] Plaintiff argues that NFD's false advertising violates Chapter 93A.[148] Plaintiff argues that NFD's 15% Promotion[149] was literally false in several ways, including: (a) Aaron Rosenberg's confirmation that NFD, at most, only provides a 13% discount; and (b) NFD has never given a free carpet or flooring job.[150] Plaintiff also pointed to various inconsistencies between the testimony of the Rosenbergs', such as at one time alleging that the

---

[146] NFD points to four cases in particular, none of which resemble Plaintiff's conduct. First, the SJC dealt with a party that had instituted a lawsuit as a marketing tool and obtained an injunction by making knowing misrepresentations in its complaint. <u>Datacomm</u>, 396 Mass. at 776. Second, <u>Fafard Real Estate & Development Corp. v. Metro-Boston Broadcasting, Inc.</u>, 345 F. Supp. 2d 147, 154 (D. Mass. 2004), discussed a plaintiff who brought suit maliciously for the purpose of gaining unfair leverage over the defendant in the midst of negotiations to acquire the defendant's property. Third, <u>North Shore</u>, 491 F. Supp. 2d at 131–32, found that a jury could conclude that a suit was vindictive because a party had sued based on preliminary reports that were subject to final revision and had refused to engaged in any further dealings with the opposition. Fourth, in <u>Refuse & Environmental Systems, Inc. v. Industrial Services of America, Inc.</u>, 932 F.2d 37, 43 (1st Cir. 1993), the First Circuit agreed that bringing a lawsuit in spite of the evidence may indeed constitute an unfair and deceptive practice under 93A.

[147] Pl. Empire Today, LLC's Mot. Strike Def.'s Mot. J. Chapter 93 Claim, 1–2 [#327].

[148] Pl. Empire Today, LLC's Mem. Law Supp. Mot. J. Chapter 93A Claim, 2–6 [#328] [hereinafter Pl.'s Mem. Supp. Mot. 93A].

[149] <u>See</u> <u>supra</u> notes 37–39 and accompanying text.

[150] Pl.'s Mem. Supp. Mot. 93A, 3–6 [#328].

promotion accounted for very little business and at other times claiming that the promotion was used "all day long" and "on every single customer."[151]

To establish a false advertising claim under Chapter 93A, a plaintiff must prove all of the elements of a false advertising claim under Section 43(a) of the Lanham Act.[152]  As the First Circuit has explained:

> [T]o prove a false advertising claim under the Lanham Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.[153]

A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or proving that it is implicitly false (i.e., true or ambiguous yet misleading).[154]  If an advertisement is literally false, a violation can be established without evidence of consumer deception.[155]  If the advertisement is implicitly false, the plaintiff has an additional burden to show that the advertisement conveys a misleading message to the viewing

---

[151] Pl.'s Mem. Supp. Mot. 93A, 4–6 [#328].  Given this court's disposition of Plaintiff's Chapter 93A claim, it need not consider Plaintiff's request for attorneys' fees, costs and pre-judgment interests under Chapter 93A.  See Pl.'s Mem. Supp. Mot. 93A, 7 [#328].

[152] Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 120 n.3 (D. Mass. 1995).

[153] Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310–11 (1st Cir. 2002) (citing Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 n.6 (1st Cir. 2000)).

[154] Id. at 311 (internal citation omitted).

[155] Id. (internal citations omitted).

public.[156] Additionally, a plaintiff seeking damages must show actual harm to its business.[157]

NFD's conduct did not rise to the level of unfair or deceptive conduct required under Chapter 93A. In particular, Plaintiff has failed to establish at least three elements under Section 43(a) of the Lanham Act.

        a.      <u>Falsity</u>

Plaintiff has not demonstrated that NFD's 15% Promotion was literally false. In this respect, this court agrees with the jury's finding regarding Plaintiff's Chapter 93A claim.[158] This court's agreement with the jury may well be sufficient to deny Plaintiff's 93A <u>Motion</u>.[159] But this court will nonetheless address Plaintiff's arguments.

First, Plaintiff's argument that NFD did not honor the 15% discount as a standard practice and therefore engaged in false or misleading advertising is not supported by the record. All of Plaintiff's examples of alleged falsity of NFD's 15% Promotion are defeated by the fact that NFD's 15% Promotion was subject to certain conditions.[160] For instance, an exhibit in which a sales representative provided a 10% discount to a customer only demonstrated an instance of the

---

[156] <u>Id.</u> (internal citation and quotation marks omitted).

[157] <u>Id.</u> Such a plaintiff must also show that consumers were actually deceived by the misrepresentations unless the plaintiff can avail itself of a "presumption to that effect." <u>Id.</u> at 311 n.9 (internal citation omitted).

[158] <u>See</u> Verdict Form, 4 [#269] (finding that Plaintiff did not prove NFD's advertisements made false representations or that that NFD's advertisements were likely to mislead consumers).

[159] <u>See, e.g.</u>, <u>Cahill v. TIG Premier Ins. Co.</u>, 20 F. Supp. 2d 141, 143 (D. Mass. 1998) (denying a Chapter 93A claim where the jury denied all but the plaintiff's breach of contract claim, which did not rise to the level of a Chapter 93A violation on its own).

[160] <u>See</u> Trial Tr. vol. 10, 110:14–24 [#24] (Sam explaining terms); Trial Tr. vol. 7, 187:18–20 [#268] (Aaron testifying about disclaimers on commercials regarding qualifying terms); <u>see</u> <u>supra</u> note 41 and accompanying text.

15% Promotion's conditions not being satisfied, not of the 15% Promotion being dishonored.[161]

Likewise, of the various NFD purchase orders where less than 15% was given to customers, none

were established as matching the conditions of the 15% Promotion.[162]  Also, even if sales

representatives earned higher commissions for providing discounts under 15% and it was within

their discretion to offer certain discounts,[163] no evidence indicates that NFD encouraged sales

representatives to give less than 15% to customers who qualified for the 15% Promotion.  And

even the customer orders showing Dan Rosenberg's alleged miscalculations of 15% (and other

percentages)[164] were not definitively established as qualifying for the 15% Promotion.[165]

Second, and separately, the different ways that Dan Rosenberg calculated 15% and the

testimony surrounding the issue does not reflect literally false advertising.  Instead, the testimony

reveals that NFD and the Rosenbergs generally thought that they were consistently providing 15%

to customers when the customers qualified for the 15% Promotion.[166]  At worst, the 15%

---

[161] See Trial Tr. vol. 10, 149:18–150:7 [#308] (Sam Rosenberg explaining that the document reflected a situation in which the customer received something different from NFD than she had been quoted from the competitor).

[162] See Pl.'s Trial Ex. 1.

[163] See Pl.'s Mem. Supp. Mot. 93A, 3–4 [#327].

[164] See Pl.'s Ex. C.

[165] The record only established that they were evidence of NFD beating competitor's prices:
Q: And Exhibit C was produced to show price beats, correct?
A: I'm not sure why it was produced, but I think it shows that.

Trial Tr. vol. 6, 151:23–152:1 [#262].

[166] Plaintiff claims that Dan and Aaron Rosenberg were unequivocal that NFD has always beat competitors prices by 13% and not 15%.  See Pl.'s Mem. Supp. Mot. 93A, 4–5 [#327].  But this assertion crumbles upon closer inspection of the record, which reveals, at most, an internal

31

Promotion more likely suggested an internal disagreement at NFD over a mathematical

calculation.[167]  It was a disagreement that was only used in a small percentage of instances,[168]

none of which were clearly established as qualifying for the 15% Promotion.[169]  Such a reasonable

but incorrect interpretation of a matter does not alone constitute unfair and deceptive conduct.[170]

Even if, arguendo, NFD or the Rosenbergs' behavior was negligent, negligence alone does not

support Chapter 93A liability.[171]  The internal disagreement, therefore, did not indicate that NFD

did not intend to honors its intentions or that its 15% Promotion was literally false.

    Third, Plaintiff's attempt to paint the Rosenbergs' testimony as contradictory or not

credible is not supported when viewing the record as a whole.  For instance, Sam Rosenberg's

_____

disagreement.  Plaintiff, for instance, points to Dan Rosenberg's (out of context) statement that the math is "consistent throughout the whole period of time."  Pl.'s Mem. Supp. Mot. 93A, 5 [#327].  But Dan Rosenberg says in the next sentence, "It's a discount of 15 percent."  Trial Tr. vol. 6, 156:16–17 [#262].

    [167] Compare Trial Tr. vol. 6, 154:6–155:9 [#262] (Dan Rosenberg explaining his method of calculation), with Trial Tr. vol. 7, 173:22–174:3 [#268] (Aaron Rosenberg testifying "I don't think we're only beating them by 13%; I think we're beating them by 15% . . .so the math's the math; you know, there's no argument about that"), and Trial Tr. vol. 10, 115:1–8 [#308] (Sam Rosenberg testifying that he was unaware of Dan's method).

    [168] Dan Rosenberg appeared to stand alone in his mistaken interpretation.  See, e.g., Trial Tr. vol. 8, 122:21–123:9 [#291]; see supra notes 42–44 and accompanying text.

    [169] That is, his behavior was therefore not definitively linked to the 15% Promotion.

    [170] See, e.g., Aquino v. Pacesetter Adjustment Co., 416 F. Supp. 2d 181, 191, 200 (D. Mass. 2005) (holding that an insurer's statements regarding coverage that were based on a reasonable but incorrect interpretation of the policy did not rise to a violation of 93A).

    [171] See, e.g., Darviris v. Petros, 442 Mass. 274, 278 (2004) ("A negligent act standing by itself does not give rise to a claim under [G. L.] c. 93A.  There must in addition be evidence that the negligence was or resulted in an unfair or deceptive act or practice." (internal citation and quotation marks omitted)); Moylan, 423 Mass. at 151 (affirming a finding that no 93A violation occurred even where jury had found that the defendant was negligent because the defendant did not engage in dishonesty, fraud, deceit, or misrepresentation).

statements regarding the small share of total orders calculated by this 13% method is not

contradicted by the Rosenbergs' statements about providing 15% "every single day" or "all day

long."[172] That is, NFD could beat competitor's quotes every day without this practice

constituting a substantial portion of NFD's total business.[173] Plaintiff's claim that Sam

Rosenberg's testimony is not credible because he was not involved in the day-to-day 15%

calculation is irrelevant.[174] Sam Rosenberg was merely pointing out that the sales representatives

primarily apply the 15% Promotion in the field "by themselves."[175] The 15% Promotion was

nonetheless created by Sam or Aaron.[176] Moreover, this is a curious argument given that Plaintiff,

through an alter ego claim against Sam Rosenberg, repeatedly claimed that Sam Rosenberg was

an integral component of NFD.[177] It is therefore reasonable to not immediately discard Sam

Rosenberg's statements regarding NFD's operations.

Additionally, NFD told the BBB its method of calculating 15%,[178] and nothing suggests

---

[172] Pl.'s Mem. Supp. Mot. 93A, 5 [#327].

[173] These statements were in fact often uttered in the same sentence or breath. See, e.g., Trial Tr. vol. 10., 109:12–18 [#308] ("We beat the price by 15 percent. It's, you know, probably 10 percent of our business every day involves price beats."). Moreover, Sam Rosenberg's statement that NFD gives "15% on every single customer" was also not contradictory. Trial Tr. vol. 10, 147:4–5 [#308]. Given the context of his testimony, this statement reasonably meant that NFD would attempt to offer the 15% Promotion to every customer, and only those customers whose orders met the 15% Promotion's conditions would be entitled to a 15% discount.

[174] See Pl.'s Mem. Supp. Mot. 93A, 5 [#327].

[175] Trial Tr. vol. 10, 111:19–23 [#308].

[176] Trial Tr. vol. 10, 108:9–10 [#308].

[177] See, e.g., 3d Am. Compl., 46–47 [#148]; Trial Tr. vol. 12, 63:7–64:16, 65:11–17 [#301].

[178] Pl.'s Trial Ex. EEEE, NFD005110.

that the BBB accused NFD of making false statements specifically about its "15% or its free

guarantee."[179]  Accordingly, Dan Rosenberg's instances of dividing by 1.15 fall into this pattern of

internal disagreement.

Also, Plaintiff's argument that the 15% Promotion is literally false because NFD has never

given away carpet or flooring for free[180] is flawed.  Just because NFD has never been in a position

to give away anything for free does not mean that it would not readily do so if it were unable to

lower the price by 15% on a qualifying offer.

In sum, there clearly was no practice that would make the 15% Promotion literally false.

There is insufficient evidence to conclude that NFD was not providing consumers 15% on

qualifying offers or providing products for free when it failed to do so.

### b.    Consumer Deception

Plaintiff does not argue that the alleged misrepresentation deceived a substantial portion of

the consuming public.  Plaintiff has not shown through consumer surveys, for instance, that

consumers were misled by the alleged misrepresentations.[181]  Plaintiff presumably relies on its

---

[179] NFD's communication may reveal the same sort of internal disagreement regarding NFD's calculation.  See Trial Tr. vol. 6, 155:15–156:7 [#262] (Dan Rosenberg explaining that letter to BBB contains a "typo that instead" of saying NFD multiplies by 1.15, should have said NFD divided by 1.15).  Regardless, this court is not compelled to follow the BBB's views of an organization.  See, e.g., Timothy Noah, Busted Watchdog: Is the Better Business Bureau a Protection Racket?, Slate (December 7, 2010, 7:38 PM), http://www.slate.com/id/2277100/; David Lazarus, Better Business Bureau Grades Companies on a Peculiar Curve, L.A. Times, Jan. 21, 2009, http://articles.latimes.com/2009/jan/21/business/fi-lazarus21.

[180] See Pl.'s Mem. Supp. Mot. 93A, 6 [#327].

[181] See Cashmere, 284 F.3d at 310 n.6.

view that NFD's advertisements were literally false.[182]  Given this court's conclusion that NFD's claims were not literally false, Plaintiff has also not satisfied this element.

    c.    <u>Causation and Damages</u>

Plaintiff calculates $1.6 million in damages based upon $20 on every $1000 of revenue generated since NFD's inception.[183]

The First Circuit has explained that "[i]n order to prove causation under § 1125(a) of the Lanham Act, the aggrieved party must demonstrate that the false advertisement actually harmed its business."[184]  A "precise showing is not required" and a diversion of sales, for example, may suffice.[185]  But a plaintiff must prove a casual connection between the alleged misrepresentations and the harm sustained.[186]

Plaintiff fails to provide sufficient evidence of how it has been harmed by NFD's alleged conduct in the 15% Promotion.  The evidence does not demonstrate a casual connection between NFD's representations and the alleged harm that Plaintiff sustained.  Contrary to Plaintiff's understanding, the money that NFD "saved" would not automatically be Plaintiff's damages. Rather, the evidence provided a bounty of reasons for Plaintiff's suffering sales, most of which

---

[182] <u>See</u> <u>Id.</u> at 314–15 (discussing a presumption of consumer deception for literally falsity claims).

[183] Pl.'s Mem. Supp. Mot. 93A, 8 [#327].

[184] <u>Cashmere</u>, 284 F.3d at 318.

[185] <u>Id.</u> (internal citation and quotation marks omitted).

[186] <u>Id.</u> at 318 n.16; <u>see also</u> <u>Heller Fin. v. Ins. Co. of N. Am.</u>, 410 Mass. 400, 409 (1991) ("[T]he evidence must warrant a finding that a causal relationship existed between the [alleged] misrepresentation and the injury." (internal citations omitted)).

focused on Plaintiff's management issues and NFD's generally low prices.[187]  Plaintiff's reliance

on the fact that an increase in NFD's sales corresponded to a decrease with Plaintiff's sales[188] only

proves a correlation, not a causation.  Plaintiff may argue that the evidence supported a finding

that advertising affected leads and leads affected sales.  But, first, Plaintiff has not in fact

presented a causal relationship between NFD's 15% Promotion itself and a decrease in Plaintiff's

sales.  Plaintiff, for instance, has not presented evidence of any consumers who chose to purchase

NFD's products instead of Plaintiff's products because of the 15% Promotion.[189]  Second, there is

a paucity of evidence supporting Plaintiff's argument and an abundance of evidence pointing to

causes that are not the 15% Promotion.  If there is evidence presenting "inconsistent positions on

a crucial issue of fact," it is appropriate to agree with the jury, which is "best suited to resolve"

such a dispute.[190]  Plaintiff's claim therefore fails on the fifth element.

    C.    Additional Motions

        1.    NFD's Motion for Attorneys' Fees Pursuant to 15 U.S.C. § 1117(a)

A Lanham Act defendant is entitled to an award of its attorneys' fees in "exceptional

cases" if it succeeds on its defense.[191]  The "party requesting attorneys' fees must prove the

---

[187] See supra notes 54–60 and accompanying text.

[188] See supra note 54 and accompanying text.

[189] Cf. Am. Med. Sys., Inc. v. Biolitec, Inc., No. 08-30061-MAP, 2011 U.S. Dist. LEXIS 33604, at *43 (D. Mass. Mar. 30, 2011) (explaining that the plaintiffs had failed to demonstrate any injury caused by the alleged falsity because there was no evidence of any consumer who choose the other product over plaintiff's due to the alleged misrepresentation).

[190] Cashmere, 294 F.3d at 320.

[191] See 15 U.S.C. § 1117(a); Yankee Candle Co. v. Bridgewater Candle Co., 140 F. Supp. 2d 111, 119 (D. Mass. 2001) (recognizing the defendant as a "prevailing party"), abrogated on other grounds, 259 F.3d 25 (1st Cir. 2001); Ting Ji v. Bose Corp., 647 F. Supp. 2d 80, 83 (D.

exceptional circumstances by clear and convincing evidence."[192]  The determination of whether to award attorneys' fees in an "exceptional case" lies within a court's discretion.[193]

NFD requests an award of attorneys' fees pursuant to the Lanham Act.  NFD argues that attorney fees should be awarded to it, the prevailing defendant, because Plaintiff engaged in abusive and expensive litigation and brought unfounded claims.[194]  Moreover, Defendant relies on a Seventh Circuit decision, Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC,[195] which recently held that a plaintiff's abuse of process constitutes an "exceptional case" warranting the award of attorneys' fees to a successful Lanham Act defendant.[196]  Because, NFD argues, the jury found that Plaintiff engaged in an abuse of process by bringing this suit, including presumably its Lanham Act claim, this is an exceptional case warranting an award of attorneys' fees.

NFD's request for attorney' fees here fails.  First, NFD has not met the more relevant standard for attorneys' fees in the First Circuit under the Lanham Act.[197]  The First Circuit has

---

Mass. 2009) (same).  See generally Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC, 626 F.3d 958 (7th Cir. 2010) (noting a general agreement among courts that "prevailing party" includes defendants).

[192] Gillette Co. v. Norelco Consumer Prods. Co., 69 F. Supp. 2d 246, 267 (D. Mass. 1999) (citing Seven-Up Co. v Coca-Cola Co., 86 F.3d 1379, 1390 (5th Cir. 1996)).

[193] Gillette, 69 F. Supp. 2d at 267 (citing BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir. 1994); Seven-Up, 86 F.3d at 1390).

[194] Nat'l Floor Direct, Inc.'s Mem. Supp. Mot. Att'y's Fees Pursuant 15 U.S.C. § 1117(A), 2–3 [#322] [hereinafter NFD Mem. Supp. Mot. Fees § 1117(A)].

[195] 626 F.3d 958 (7th Cir. 2010).

[196] See NFD Mem. Supp. Mot. Fees § 1117(A), 2–4 [#322].

[197] See Ting Ji v. Bose Corp., 626 F.3d 116, 129 (1st Cir. 2010).  The Seventh Circuit's Nightingale decision is not binding on this court.  See, e.g., Diaz v. Metro. Life Ins. Co., 688 F. Supp. 2d 49, 61 n.18 (D.P.R. 2010); cf. Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir.

approved (or at least not disapproved of) a standard that requires that NFD, as a defendant, show something less than bad faith, such as a plaintiff's use of groundless arguments, failure to use controlling law, and generally oppressive nature of the case.[198]  Here, NFD has not pointed to the use of any groundless arguments or Plaintiff's failure to use controlling law.  NFD has not argued here (nor demonstrated) that the suit is generally oppressive.[199]  Plaintiff's suit was not, for instance, completely lacking in merit.[200]  In fact, Plaintiff presented a substantial amount of evidence on its false advertising and trademark infringement claims.  Both claims went to the jury[201] and there was seemingly no dispute regarding two of the three elements of the trademark infringement claim.[202]

---

2004) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." (internal citations omitted)).

[198] Ting Ji, 626 F.3d at 129 (acknowledging that is has never determined the appropriate standard to apply to requested for attorneys fees by prevailing defendants under Section 1117(a) but deciding it need not reach the issue because the parties had agreed to apply the district court's standard).

[199] See Eagles, Ltd. v. Am. Eagle Found., 356 F.3d 724, 728–29 (6th Cir. 2004) (explaining that a prevailing defendant may show that a suit was oppressive if "it lacked merit, had elements of an abuse of process claim, and plaintiff's conduct unreasonably increased the cost of defending against the suit" (emphasis added) (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001))).

[200] Cf. Ferraris Med., Inc. v. Azimuth Corp., No. 99-66-M, 2002 U.S. Dist. LEXIS 13589, at *6 (D.N.H. July 24, 2002).

[201] See Verdict Form, 3–4 [#296].

[202] See Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 60 (1st Cir. 2008). That is, there was no dispute that Plaintiff owned a valid trademark, see Pl.'s Trial Ex. 103, and little to no dispute that NFD had used Plaintiff's mark without permission, see Trial Tr., vol. 6, 111:17–25 [#262]; Pl.'s Trial Ex. 39, 40; see also Verdict Form, 3–4 [#296] (focusing on whether NFD's purchase of Plaintiff's trademarks intended to deceive consumers and whether there was a likelihood of consumer confusion).

Second, even if this court were to consider the Seventh Circuit's <u>Nightingale</u> decision, would not be entitled to attorneys' fees. <u>Nightingale</u> is factually distinguishable from this case. In <u>Nightingale</u>, the district court had granted summary judgment in favor of defendant on the plaintiff's Lanham Act false advertising claim early in the litigation because the claim lacked "any merit" and was "disingenuous."[203] Here, however, Plaintiff's claim was meritorious enough to go to the jury and falter on perhaps only one of three statutory elements.[204] Moreover, the Seventh Circuit's vision of a typical "exceptional" case was far removed from this case. NFD is correct that <u>Nightingale</u> held that a case is "exceptional" if a plaintiff is guilty of abuse of process. But the Seventh Circuit described the conditions sufficient to make a case "exceptional" as when the party's claim is "objectively unreasonable"—that is, a claim that a rational litigant would pursue "only because it was extortionate in character if not necessarily in provable intention."[205] As this court has already found in denying NFD's Chapter 93A claim, however, Plaintiff's conduct did not signify an unfair or unscrupulous,[206] or similarly, extortionate, character. NFD fails to fit this case within the facts or the spirit of the Seventh Circuit's decision.

IV.     <u>Conclusion</u>

This court has chosen not to disturb the jury's verdict. Plaintiff's <u>Motion for Judgment as a Matter of Law, Pursuant to Fed. R. Civ. P. 50(b)</u> [#303] is therefore DENIED. The various

---

[203] <u>Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC</u>, No. 1:06-cv-1435-SEB-WTL, 2010 U.S. Dist. LEXIS 32195, at *5–6 (S.D. Ind. Mar. 31, 2010) (granting summary judgment in part because the two misrepresentations did not constitute "commercial advertising or promotion" actionable under the Lanham Act (internal citations omitted)).

[204] <u>See</u> <u>supra</u> note 202 and accompanying text.

[205] <u>Nightingale</u>, 626 F.3d at 965.

[206] <u>See</u> <u>supra</u> notes 132–46 and accompanying text.

motions asserting claims under Chapter 93A—NFD's <u>Motion for Judgment on Its Counterclaim Under M.G.L. Chapter 93A</u> [#312], Plaintiff's <u>Motion to Strike Defendant's Motion for Judgment on Its Chapter 93A Counterclaim</u> [#324], Plaintiff's <u>Motion for Judgment on Its Chapter 93A Claim</u> [#327], and NFD's <u>(1) Opposition to Empire's Motion to Strike NFD's Chapter 93A Counterclaim; (2) Opposition to Empire's Motion to Strike NFD's Fee Petition, or in the Alternative, (3) NFD's Motion to Amend Counterclaim</u> [#333]—are also DENIED for the reasons detailed above. Moreover, NFD's <u>Application for Attorney's Fees and Costs Under Mass. Gen. L. Ch. 93A</u> [#316], for the foregoing reasons, is DENIED. Lastly, NFD's <u>Motion for Attorneys' Fees Pursuant to 15 U.S.C. § 1117(A)</u> [#321] and Plaintiff's <u>Motion to Strike Defendant's Application for Attorney's Fees and Costs Under Mass. Gen. L. Ch. 93A</u> [#331] are DENIED.[207]

AN ORDER HAS ISSUED.

          <u>   /s/ Joseph L. Tauro   </u>
          United States District Judge

---

[207] Plaintiff's <u>Assented to Motion to Redact Portions of Trial Record</u> [#320] and NFD's <u>Assented to Motion to Redact Portion of Trial Record</u> [#337] are ALLOWED.